## Baker, et al. v. Baker, Eccles & Company, et al.

(Decided February 11, 1915.)

### Appeal from McCracken Circuit Court.

1. Judgment—On Constructive Service—When Void on Account of Defect in Affidavit for Warning Order.—It is indispensable that an affidavit for a warning order against a non-resident defendant should aver that the defendant was absent from or believed to be absent from the State. In the absence of this averment the clerk has no authority to make a warning order and the judgment rendered on such constructive service is void.

2. Judgment—Affidavit for Warning Order—Presumption as to Sufficiency of.—When the affidavit fails to state that the defendant is absent or believed to be absent from the State, it will not be presumed that he was absent from the averment that he was a non-resident of the State and resided in another State, as he might be, legally speaking, a non-resident and yet actually be in this State when the affidavit was made.

3. Judgment—Collateral Attack on—Presumption.—When a collateral attack is made on a judgment, every presumption must be indulged that will support the judgment, for on collateral attack a judgment cannot be successfully assailed unless it is void for a want of jurisdiction in the court to render the judgment that appears upon the record.

4. Judgment—Direct and Collateral Attack Defined.—A direct attack on a judgment can only be made in the manner pointed out in the code; that is to say, by prosecuting an appeal or by proceeding in the manner pointed out in Sections 344, 414 and 518 for the modification or vacation of judgments. An attack made on a judgment in any other way is a collateral attack.

5. Judgment—Presumption on Collateral Attack.—If the record does not affirmatively show everything that was done, the presumption will be that the things it does not show have been done in such a manner as that there would be no defect; but if the record affirmatively shows everything in such a way as that no presumption can be indulged in, the record must control. Therefore, when the whole record affirmatively shows a defect that deprives the court of jurisdiction, the judgment must be treated as void.

6. Judgment—Foreign Judgments of Probate Court—Validity and Effect of.—The judgment of a probate court of a sister State, entered in an ex parte proceeding, finding that the decedent was a resident of the county, does not affect the rights of persons in another State interested in the estate who were not parties to the proceedings.

7. Judgment—Against Party Not Before Court Void.—No person can be deprived by legal proceedings of property unless he has been given notice, in the manner provided by law, that his right to the property is about to be determined and that he must defend if he desires to save it.

8. Judgment—Foreign Judgment of Probate Court—Residence.—The judgment of a probate court, rendered in an ex parte proceeding adjudging that the decedent was a resident of the State and county in which the court sat, does not preclude interested persons living in another State from showing, in opposition to the judgment, that the decedent was not a resident of the State or county.

9. Judgment—Foreign Judgment—Force and Effect of on Descent and Distribution of Property.—The judgment of a court of general jurisdiction in a sister State in proceedings to settle the estate of an intestate, to which interested persons in this State were parties, by constructive service, does not affect property of the intestate having a situs in this State or determine the rights of the non-residents in such property, although 'it is conclusive of their rights as to property situated in the State where the judgment was rendered.

10. Judgment—Estates of Decedents—Situs of Property—Rights of Parties.—Where an intestate dies leaving property in several States, a court of sufficient jurisdiction in any of these States may, in proceedings to settle his estate, in which non-resident, interested persons are made parties by constructive service, determine conclusively the rights of all the parties as to the property situated in the State, but cannot conclusively determine their rights as to property having a situs in other States. Nor does the fact that the court adjudged that the intestate was a resident of the State change this rule.

11. Judgment—Foreign Judgments—Force and Effect of.—Where the judgment of a sister State determined the residence of an intestate and the descent of his estate in a proceeding in which non-resident, interested parties were before the court by constructive service, and a suit is brought on that judgment in this State for the purpose of recovering property here situated, it may be attacked in so far as it attempts to affect property situated in this State, but it is conclusive as to the property situated in the State where it was rendered. Nor is this rule changed by the adjudication that the intestate died a resident of the State where the judgment was rendered.

12. Judgment—Conflicting Judgments in Suits to Settle an Estate.— If an intestate dies leaving property in several States and suit is brought in each State to settle his estate on the ground that he

died a resident of that State; interested, non-residents who are before the court only by constructive service may attack the extra-territorial effect of any of the foreign judgments in a suit to enforce them in another State.

13. Domicile—Residence.—A person cannot have a legal residence in two States or countries, although he may have an actual residence in many places and his actual residence may be in one place and his legal residence in another.

14. Domicile—Residence—Intention—Acts and Conduct.—The place of legal residence is fixed both by intention and acts and conduct, and when it is difficult to reconcile the intention with the acts and conduct, the law will, from the facts and circumstances, fix the legal residence.

15. Domicile—Residence—Definition of Legal Residence.—If a person has actually removed to another place with the intention of remaining there for an indefinite time and as a place of fixed domicile, it is to be deemed his place of domicile, notwithstanding he may entertain a "floating intention" to return at some future period.

16. Domicile—Residence—Intention—Acts and Conduct.—When there is a conflict between intention and acts and conduct, the acts and conduct will control.

C. C. GRASSHAM, BERRY & GRASSHAM, PITTS & McCONNICO and E. W. ROSS for appellants.

WHEELER & HUGHES for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This litigation, concerning the descent and distribution of the personal estate of Charles Baker, and which involves one important and disputed question of fact and several interesting questions of law, arose in this way: Charles Baker was born and lived for a number of years at or near the town of Savannah, in Hardin county, Tennessee. In 1901 he came to Paducah, Kentucky, and engaged in the mercantile business, in which business he remained at Paducah from that time until his death in 1912.

In September, 1912, while en route to his old home in Tennessee for a visit, he died while on board a steamboat in Humphrey county, Tennessee, leaving surviving, as his only heirs-at-law, his widow, the appellant, Mrs. Josie C. Baker, his mother, the appellee, Mrs. Augusta H. Baker, and a brother, E. W. Baker. At the time of his death he owned real property situated in Hardin county, Tennessee, also some personal estate located in that county, as well as valuable personal estate having

a situs in Paducah, Kentucky, consisting of shares of stock in the Paducah Corporation of Baker, Eccles & Company, and a large debt against this corporation.

In November, 1912, his widow applied to the County Court of Hardin county, Tennessee, for letters of administration on the estate of her husband. The proceedings in this court, which were entirely *ex parte,* were had on the motion of the widow. The request was granted and the order of the Hardin County Court appointing her administratrix recites that "at the time of his death the residence of the said Charles Baker was in Hardin county, Tennessee, and that he left therein estate, goods and chattels, rights and credits, the granting of the administration whereof belongs to this court; and Mrs. Josie C. Baker, the widow of the said Charles Baker, deceased, having applied for letters of administration on his estate, and she having a right thereto under the laws of the State of Tennnessee, and the court being satisfied of her right to so administer, it is therefore ordered and decreed by the court that said application made by the said Mrs. Josie C. Baker for the granting of letters of administration on said estate to her be granted."

At another term of this county court, held in December, 1912, it appears that Mrs. Baker presented a settlement of her accounts as administratrix, and thereupon this order was made: "It further appearing to the court, from proof introduced to and heard by the court, that the said Charles Baker died intestate, and at the time of his death was a resident of Hardin county, Tennessee, that he left no children or descendants of such surviving, but left surviving his widow, the said Mrs. Josie C. Baker, and, under the laws of the State of Tennessee, the said Mrs. Josie C. Baker, as the widow of the deceased, is entitled to all of the surplus personal property of the estate, and the court being of the opinion that she is entitled to receive and hold as her own individual property all of the surplus personalty of the estate, after payment of the debts of the same and the expenses of the administration, so adjudges and decrees."

It further appears from the settlements and orders of this court that the debts due by the deceased were few in number and trifling in amount, and that the widow as administratrix had in her possession certificates of stock owned by the deceased in the corporation of Baker, Ec-

cles & Co., of Paducah, of the value of $27,000, and also some other personal assets of small value. On this showing it was ordered and adjudged by the court that Mrs. Baker as administratrix transfer and deliver to herself as the widow of the deceased all of the personal estate in her possession, including these shares of stock, and this was done as appears from the settlements and receipts filed in this court.

It will be observed that the order appointing Mrs. Baker administratrix recites that the court heard proof on the subject of the place of the intestate's residence at the time of his death, but the record does not disclose what character of proof was heard, nor does it appear from the record that his mother or any other persons interested in his estate or its distribution were in any manner parties to this county court proceeding or had any notice of it.

Subsequent to these proceedings in the county court, and on December 28, 1912, Mrs. Josie C. Baker individually and as administratrix of Charles Baker filed in the chancery court of Hardin county, Tennessee, her petition in equity, or bill of complaint, as it is called in the Tennessee practice, against Mrs. Augusta H. Baker, the mother, and E. W. Baker, the brother of the deceased, who were then residents of Paducah, Ky., and also against several persons who were residents of Hardin county, Tennessee. In her petition she set out her appointment as administratrix of the estate of Charles Baker in the Hardin County Court and averred that her husband died intestate, a resident of, and domiciled in Hardin county, Tennessee, leaving surviving him as his sole heir and distributee his widow, and as his only other heirs-at-law his brother, E. W. Baker, and his mother, Mrs. Augusta Baker.

The petition further set up her ownership of the stock in the Paducah corporation of Baker, Eccles & Co., the interest of the deceased in several tracts of land in Tennessee, and averred that Mrs. Augusta Baker was asserting some claim and interest in the Tennessee lands owned by Charles Baker, and also to one-half of the personal estate left by him, upon the theory that he died a resident of the State of Kentucky, and, under the laws of that State, his mother was entitled to one-half of his surplus personal estate.

The prayer of her petition was that Mrs. Augusta Baker and E. W. Baker be brought before the court in the manner provided for non-residents and be required to assert whatever claim they might have to the estate left by the deceased. She further prayed that it be adjudged that Charles Baker died a resident of the State of Tennessee, and that she as his widow was the sole distributee and entitled to all of his personal estate after the payment of his debts, and for all other and proper relief.

On the filing of this petition an order of publication was made citing Mrs. Augusta Baker and E. W. Baker, as non-residents, to make defense to the petition on a named day, and it is not questioned that these defendants were regularly proceeded against under the law of Tennessee, as non-resident defendants, although they did not appear in the action.

On April 7, 1913, an order was entered by the court reciting that these non-resident defendants were regularly before the court by publication and having failed to make any defense, the petition, under the Tennessee practice, was taken for confessed as to them. It also appears that in April the depositions of several witnesses were taken for the plaintiff for the purpose of establishing among other things that Charles Baker was a resident of Tennessee at the time of his death.

On May 2, 1913, a judgment was entered in this chancery case adjudging that ''the said Charles Baker at the time of his death was a citizen of, and had his domicile at Savannah, Tennessee; that at no time was he a citizen of and domiciled at Paducah, Kentucky; that all of his life he was a citizen of and had his domicile at Savannah, Tennessee, and the court so adjudges and decrees.''

It was further adjudged that his widow was the sole distributee, and as such entitled, in accordance with the laws of Tennessee, to the whole of the surplus personal property of which he died the owner. She was further adjudged entitled to the 270 shares of stock in the Baker, Eccles & Co. corporation and the accumulated profits thereon.

This is all that need be said at this time respecting the proceedings in the Tennessee courts and the orders and judgments therein made.

Turning now to the Kentucky proceedings, it appears that on November 27, 1912, Mrs. Augusta Baker, mother

of Charles Baker, was granted letters of administration on his estate by the County Court of McCracken county, Kentucky, and, on December 3, 1912, as such administratrix she filed a petition in the McCracken Circuit Court for a settlement of the estate of Charles Baker, and to this petition his widow and Baker, Eccles & Co. were made defendants. In this petition it was averred that Charles Baker died a resident of McCracken county, Kentucky, the owner of shares of stock in the Baker, Eccles & Co. corporation of the value of $27,000, together with accumulated profits thereon, and some other articles of personal property, and also a claim of several thousand dollars against Baker, Eccles & Co. She also set up that herself and the widow were the only heirs-at-law of the decedent entitled to an interest in his estate, and that she was entitled to one-half of his personal estate after the payment of debts and the widow to the other one-half.

In this action Mrs. Josephine Baker was proceeded against as a non-resident defendant, but whether she was brought before the court by virtue of these proceedings is a question that will later be disposed of. For the present it is sufficient to say that Mrs. Josephine Baker did not appear in this action, and on February 13, 1912, a judgment was rendered by the McCracken Circuit Court adjudging that Charles Baker died a resident of McCracken county, Kentucky, and that his mother, Mrs. Augusta Baker, under the Kentucky law, was entitled to one-half of the surplus personal estate of the deceased, and Mrs. Josephine Baker, as his widow, to one-half thereof.

In the judgment Baker, Eccles & Co. was directed to cancel the 270 shares of stock in the corporation issued to Charles Baker and to re-issue one-half of these shares to Mrs. Josephine Baker and to re-issue the other half to Mrs. Augusta Baker. The remaining personal property found to be owned by the deceased after the payment of debts was also directed to be divided equally between these two persons.

In June, 1913, Mrs. Josephine Baker, individually and as administratrix of Charles Baker, filed a suit in the McCracken Circuit Court against Baker, Eccles & Co., in which, after setting up the orders and judgments made in the Tennessee courts and her sole ownership of the personal estate of the deceased by virtue thereof, she

prayed that Baker, Eccles & Co. be required to transfer to her individually the 270 shares of stock to which she was adjudged entitled by the Tennessee chancery judgment, and also for judgment against it for $11,429.17, in which amount she alleged it was indebted to her husband at the time of his death. With this petition she filed certified copies of all the proceedings had in the Tennessee courts, together with a copy of the evidence heard in the chancery court of Tennessee.

To this petition Baker, Eccles & Co. filed its answer putting in issue all the averments of the petition, and also relied on the judgment of the McCracken Circuit Court in the case of Mrs. Augusta Baker heretofore mentioned.

Mrs. Augusta Baker came into this suit by an intervening petition in which she averred that Charles Baker died a resident of the State of Kentucky, and that under the laws of this State, and by virtue of the judgment of the McCracken Circuit Court in the suit brought by her, she was entitled to the interest in the estate of Charles Baker decreed to her by the McCracken Circuit Court judgment, which she averred was binding and conclusive upon Mrs. Josephine Baker. She further put in issue the validity of the orders and judgments made in the Tennessee county court, as well as in the chancery court of Tennessee, and averred that the judgments in each of these courts in so far as they determined that Charles Baker died a resident of the State of Tennessee, and that his widow was entitled to the whole of his personal estate after the payment of his debts were void, because neither of these Tennessee courts had jurisdiction to make orders or judgments so declaring, and she relied on the judgment of the McCracken Circuit Court in the suit brought by her as finally determining not only the domicile of Charles Baker at the time of his death, but the devolution of his estate.

After motions to strike out parts of the petition of Mrs. Augusta Baker, as well as demurrers thereto had been overruled, a reply was filed controverting the affimative averments of the pleading of Mrs. Augusta Baker, and it was further averred that the judgment rendered in the McCracken Circuit Court in so far as it attempted to determine the rights of Mrs. Josephine Baker was void, because she was not before the court by either actual or constructive service of process.

When the pleadings had been made up, a large amount of evidence was taken on the issue as to the residence of Charles Baker at the time of his death, and thereafter, the case having been submitted for hearing, it was adjudged that the petition of Mrs. Josephine Baker be dismissed, and from that judgment this appeal has been prosecuted.

From this necessarily extended statement of the proceedings in the Tennessee and Kentucky courts it will be seen that the real question at issue in this case is whether the widow of Charles Baker is entitled to the whole of his surplus personal estate under the Tennessee law or his mother, Mrs. Augusta Baker, to one-half of it, under the Kentucky law, and that the solution of this question depends upon the place of residence of Charles Baker at the time of his death and the force and effect to be given to the Tennessee and Kentucky judgments.

In behalf of Mrs. Josephine Baker the argument is made that the Tennessee judgments finding that Charles Baker died a resident of Tennessee are conclusive of this question whether in fact he died a resident of that State or not, and this being so, his widow, under the law of Tennessee, about which there is no dispute, was and is entitled to the whole of his surplus personal estate. It is further contended in this behalf that the Kentucky judgment rendered by the McCracken Circuit Court in the case of Mrs. Augusta Baker, in so far as it undertook to determine Mrs. Josephine Baker's interest in the estate of her husband, was void, because she was not before the court either by actual or constructive service.

For Mrs. Augusta Baker the argument is made that Charles Baker died a resident of the State of Kentucky, and therefore the Tennessee courts had no jurisdiction to determine that he died a resident of Tennessee or to distribute his estate under the laws of Tennessee, and, further, that the Kentucky judgment determining the rights of the widow and the mother is and was a valid judgment, and, as it has not been modified or vacated or any appeal prosecuted therefrom, it finally determined the rights of the parties.

Other questions upon which these respective arguments rest will be noticed in the course of the opinion.

Taking up first the validity and effect of the judgment of the McCracken Circuit Court, which, as stated, determined that Baker died a resident of Paducah, Kentucky,

and that his mother, under the laws of this State, was entitled to one-half of his surplus personal estate and his widow the other one-half, the conclusion we have reached with respect to this judgment renders it unnec-essary to discuss its effect or do more than set forth the reasons that have brought us to the conclusion that it is void in so far as it affects the rights of the widow.

In the suit in which this judgment was obtained the widow was proceeded against as a non-resident defendant. She was not actually served with process, nor did she in any manner enter her appearance to this action; so that unless the warning order proceedings were sufficient to bring her before the court on constructive service, she cannot be treated as being in any manner affected by this judgment; in other words, her status is the same as if she had not been made a party to this suit.

Without setting out in full Sections 57-61 of the Code covering the subject of constructive service, we think it sufficient for the purposes of the question we have to say that Section 57 of the Code provides that a warning order may be made upon an affidavit showing that the defendant is a non-resident of this State and believed to be absent therefrom, and also stating in what country the defendant resides or may be found and the name or place where a postoffice is kept nearest to the place where the defendant resides or may be found.

Other sections of the Code provide that when this affidavit is made the clerk of the court shall make an order warning the defendant to defend the action on the first day of the next term of the court which does not commence within sixty days after the making of the order. In other sections it is provided that the clerk at the time of making the warning order shall appoint an attorney whose duty it shall be to inform the defendant of the pendency and nature of the action and report to the court the result of his efforts.

In this suit no separate warning order affidavit was made, nor was it necessary that one should have been made if the petition itself, which was properly verified, contained the matter which should have been embraced in an affidavit. The verified petition upon this point averred that "Mrs. Josephine Baker has left the State of Kentucky and is now a non-resident thereof, and she resides at Savannah, in the State of Tennessee, at which place a postoffice is kept and which is the nearest post-office to the residence of said Mrs. Josephine Baker."

When the petition containing this affidavit was filed, a warning order, in due form, was made and a warning order attorney was appointed as provided in the Code, who, before the judgment was rendered, filed in proper form and manner a report showing that he had written Mrs. Baker at the address named, informing her of the pendency and nature of the action against her, but had not received any reply. So that the defect, if any, in these warning order steps consists in the insufficiency of the affidavit upon which the warning order was made. This affidavit is the basis of warning order proceedings, and no warning order can be made by the clerk or attorney appointed under it until the affidavit provided by the Code has been made.

It will be observed that the affidavit conforms strictly to the Code requirements except that it fails to aver that Mrs. Josephine Baker is believed to be absent from the State. It sets out that Mrs. Baker has left the State and is a non-resident thereof, and gives the place of her residence in the State of Tennessee and her postoffice in that State, but there are no words in the affidavit that supply the place of the averment that she was believed to be absent from this State at the time the affidavit was made. And we think this averment was indispensable to the sufficiency of the affidavit and that in its absence the clerk had no authority to make the warning order or to appoint the attorney. In cases like this it is alone the fact that the defendant is absent or believed to be absent from the State at the time the affidavit is made that authorizes the proceedings against him as a non-resident. If the defendant is not absent or believed to be absent from the State, he cannot be proceeded against as a non-resident and accordingly the court would have no jurisdiction on constructive service to enter a judgment affecting his rights. This is so because it is the making of the warning order that commences the action, and the clerk has no authority to make this order except on a sufficient affidavit.

Admitting this to be true, it is said that we should presume that the defendant was absent or believed to be absent from the State when the affidavit was made from the averment that the defendant was a non-resident of the State and resided in another State. But we do not think so. A defendant might be, legally speaking, a non-resident and yet be actually in the State and in the

county where the suit was brought when the affidavit and warning order were made. Redwine v. Underwood, 101 Ky., 190; Warrick v. McCormick, 150 Ky., 800.

The argument is also made that, as this is a collateral attack on the validity of the judgment of the McCracken Circuit Court, every presumption must be indulged that the proceedings in that court were regular and every step necessary to give it jurisdiction to render the judgment was properly taken.

It is true that every presumption must be indulged to support a judgment against collateral attack, for in this respect there is a well defined and distinct difference between a direct and a collateral attack on a judgment. It is also well settled that on collateral attack a judgment cannot be successfully assailed unless it is void for a want of jurisdiction in the court to render the judgment that appears upon the record. Bamberger v. Green, 146 Ky., 258; Maysville R. R. Co. v. Ball, 108 Ky., 241; Dennis v. Alves, 132 Ky., 345.

We are also clear that the attack made on this Kentucky judgment was a collateral attack, as a direct attack on a judgment can only be made in the manner pointed out in the Code; that is to say, by prosecuting an appeal or by proceedings had under the Code and in the manner pointed out in Sections 344, 414 and 518 for the modification or vacation of judgments. An attack made on a judgment in any other way is a collateral attack. Black on Judgments, Volume 1, Section 252; Vanfleet on Collateral Attack on Judicial Proceedings, Sec. 2; Duff v. Hagins, 146 Ky., 792.

Being then a collateral attack, will we presume that all the proceedings taken by the court necessary to sustain the validity of the judgment were regular? The rule upon this subject is that if the record is ancient or it does not affirmatively show everything that was done, the presumption will be that the things it does not show have been done in such manner as that if they appeared in the record there would be no defect and so the judgment on collateral attack will be treated as erroneous, but not void, and consequently not subject to collateral attack. But if the record is fresh and affirmatively shows everything in such a way as that no presumption can be indulged in that something was done that does not show in the record, then the record must control, for there is no room to presume that something

else may have been done that would cure the defect, and in this state of case if the defect is substantial the judgment is void and may be attacked collaterally. Supporting this rule reference may be had to Hynes v. Oldham, 3 T. B. Mon., 266; Benningfield v. Reed, 8 B. Mon., 102; Newcomb v. Newcomb, 13 Bush, 544; Carr v. Carr, 92 Ky., 552; Wilson v. Teague, 95 Ky., 47; Sears v. Sears, 95 Ky., 173; Segal v. Reishert, 128 Ky., 117; Steel v. Stearns Coal & Lumber Co., 148 Ky., 429; Kreiger v. Sonne, 151 Ky., 739.

The rule, however, favoring all presumptions that can be indulged in to sustain the validity of a judgment on collateral attack cannot be here invoked because the whole of a new record is here, and it affirmatively shows the absence of the conditions upon which the court had jurisdiction to render a judgment affecting the rights of a non-resident, and this being so this judgment as to the widow must be treated as void. Green's Heirs v. Breckinridge's Heirs, 4 T. B. Mon., 541; Brownfield v. Dyer, 7 Bush, 505; Arthurs v. Harlan, 78 Ky., 138; Grigsby v. Barr, 14 Bush, 330; Clark v. Raison, 126 Ky., 486.

But the invalidity of this judgment does not, as we will presently attempt to show, have the effect claimed by counsel for the appellant, or strengthen the case for the widow.

Taking up next the validity and effect of the Tennessee county court judgment, we are clearly of the opinion that so much of this judgment as undertook to adjudicate that the residence of Charles Baker was in Hardin county, Tennessee, at the time of his death, and as a legal consequence of this his widow, under the laws of Tennessee, was his sole distributee and entitled to the whole of the surplus of his personal estate, was void so far as the rights of his mother were attempted to be affected. In view of the admitted fact that Charles Baker, at the time of his death, owned both real and personal estate in Hardin county, Tennessee, there can be no doubt that under the laws of Tennessee the county court of Hardin county had power and jurisdiction to grant letters of administration on his estate to his widow. This jurisdiction and power attached by virtue of the fact that he owned real and personal property in that county and was not dependent on the condition that he died a resident of that county. If he was, in fact, at

the time of his death, a resident of McCracken county, Kentucky, the Tennessee county court would, under the circumstances, have had the same power and jurisdiction to grant letters of administration on his estate as if he had admittedly died a resident of Hardin county, Tennessee.

But it is one thing to grant letters of administration and another very different thing to determine the place of the intestate's residence for the purpose of affecting the devolution of his estate. The granting of letters of administration alone would not in any manner affect the devolution of his estate or determine the distributees or the shares to which they were entitled. The administrator would merely hold the estate in trust for the benefit of the persons entitled to the estate, with the duty of turning the estate over to such persons when their right was established and in the time and manner provided by the Tennessee law. So that the mother of Charles Baker could not and does not complain of so much of the Tennessee county court judgment as granted letters of administration upon his estate.

But manifestly this Tennessee county court could not, in this *ex parte* proceeding or application, instituted by the widow, to which his mother was not a party, on any kind of service or publication, have jurisdiction or power to adjudicate that the deceased was a resident of the State of Tennessee and thereby conclusively determine that his widow was entitled to the whole of his surplus personal estate and exclude his mother from participation. We do not know of any authority that would permit an interested party to be deprived of his right to make defense, or that would conclude him by a judgment rendered in the manner of this Tennessee judgment. Here we have two contestants for the personal estate of Charles Baker, each of them having at least some ground upon which to assert her right to an interest in his estate, and yet an inferior court, in the absence of one of the parties, undertakes to and does adjudge a fact upon which the other party becomes, by virtue of a local statute, entitled to the whole of this estate. It seems to us that a mere statement of this proposition is sufficient to conclusively refute the effect claimed for this county court judgment. It is fundamental law, recognized, as we think, by every court, that no person can be deprived in a legal proceeding

of property to which he has or asserts claim unless he has been given notice in the manner provided by law, which may, generally speaking, be said to be actual or constructive notice of the pendency of the suit and that his right to the property is about to be determined and he must defend if he desires to save it.

. Out of numerous authorities supporting these general statements we think it sufficient to refer to the leading case of Pennoyer v. Neff, 95 U. S., 714, 24 L. Ed., 565. Another case involving a question very much like this was before the court in the case of Overby v. Gordon, 177 U. S., 214, 44 L. Ed., 741. In the Overby case, which involved a contest over the distribution of the estate of one Haralson, it appears from a statement of the facts that a Mrs. Gordon instituted proceedings in an appropriate court of the District of Columbia for the purpose of probating the last will of Haralson and to obtain letters of administration. In this proceeding an issue was made as to the place of residence of the deceased at the time of his death, and there was introduced a record showing that administration on his estate had been granted by a probate court of the State of Georgia. The District of Columbia court ruled that he died a resident of the District of Columbia and denied the conclusive effect of the Georgia proceedings. In considering the case the Supreme Court said:

"The single question for consideration is, was the grant of letters of administration by the court of ordinary of De Kalb county, Georgia, competent evidence upon the issues tried in the Supreme Court of the District of Columbia respecting the domicile of the decedent at the time of his death?"

The order of the Georgia court granting letters of administration recited "that Haralson died a resident of De Kalb county, Georgia," and it was contended that this was a conclusive adjudication of the place of his residence, notwithstanding the fact that the proceedings were *ex parte* and that no notice to other interested parties was given sufficient to bring them before the court for the purpose of determining their rights. And the court said: "From the record of the proceedings instituted in the De Kalb County Court it is apparent that the ultimate purpose was to adjudicate upon and decree distribution of the estate of the deceased, the appointment of an administrator being a mere preliminary

step in the management and control by the court of assets of the estate. The question of domicile would seem to have been important only as establishing the particular court of ordinary which was vested with jurisdiction to administer the assets within the State of Georgia. The subject matter or *res* upon which the power of the court was to be exercised, was, therefore, the estate of the decedent.''

Then, after an extended discussion of the question, the court said: ''We are of the opinion that the De Kalb County Court possessed the power to determine the question of domicile of the decedent for the purpose of conclusively adjudicating the validity within the State of Georgia of a grant of letters of administration, but that it did not possess the power to conclusively bind all the world as to the fact of domicile by a mere finding of such fact in a proceeding *in rem*. In other words, proceedings which were substantially *ex parte* cannot be allowed to have greater efficacy than would a solemn contest *inter partes,* which would have estopped only actual parties to such contest as to facts which had been or might have been litigated in such contest.

''Our conclusion being that the adjudication of the fact of domicile in Georgia made in the grant of letters by the De Kalb County Court, and which was not made in a contest *inter partes,* was of no probative force upon the question of domicile in a contest in a court of the District of Columbia in the course of proceedings for the administration of assets within said District, it results that the Supreme Court of the District did not err in excluding the transcript in question, whether tendered as evidence conducing to establish or as conclusively fixing the domicile of the deceased.'' To the same effect is Thormann v. Frame, 176 U. S., 350, 44 L. Ed., 500.

If in a proceeding like the one had in this county court the rights of persons not in any manner parties to the proceeding could be conclusively determined and property to which they asserted claim be taken from them in the manner here attempted, it would follow that in all cases judgments might go affecting the rights of persons who were not parties to the proceedings, and this practice would of course be at war with the established doctrine that no person can be deprived of his property without opportunity to be heard in his defense. Black on Judgments, Vol 1, Sec. 226; Hovey v. Elliott, 169 U. S., 42 Law Ed., 215.

Our conclusion, therefore, is, upon this branch of the case, that the adjudication of the Tennessee county court that Baker died a resident of Tennessee, and accordingly his widow was entitled to the whole of his surplus personal estate, was absolutely void and open to attack in any court in which a claim under it might be asserted. Spencer v. Parsons, 89 Ky., 577; Francis v. Lilly, 124 Ky., 230; Carpenter v. Moorelock, 151 Ky., 506; Black on Judgments, Vol. 2, Section 894.

Passing now to the chancery court judgment, we find that under the laws of Tennessee the chancery court occupies substantially the same position that circuit courts do in this State. In other words, Tennessee chancery courts are courts of general jurisdiction, and accordingly have the power to settle estates of deceased persons and determine the rights of conflicting claimants thereto, as well as all other matters that may be necessary in adjudicating the rights of the parties. So that the chancery court had jurisdiction to adjudge that Baker died a resident of Hardin county, Tennessee, and that his widow, under the law of Tennessee, was entitled to the whole of his surplus personal estate. Admitting all this, and, further, that his mother was properly before the court on constructive service, the only remaining question is the effect to be given to this judgment of the chancery court when it is attempted to take under it personal property having a situs in this State. We use the expression "having a situs in this State" because we think Baker died a resident of Kentucky, and accordingly the personal estate owned by him at his death and here in controversy had a situs in this State.

On this issue counsel for the widow urgently insist that this Tennessee chancery judgment, standing as it does unmodified and unreversed, conclusively settled not only in Tennessee but everywhere every question determined by it affecting parties who were before the court by actual or constructive service, and therefore its operation and effect could not be called in question when suit was brought on it in this State.

That it had in the State of Tennessee, where it was rendered, and as to property situated in that State, the conclusive effect claimed for it, may be readily admitted, but whether it shall have that effect as to property having a situs here is another question. It is a general rule of law that judgments of courts having ju-

risdiction of the person and subject matter of the action are conclusive until modified or vacated in the manner provided by the law of the State in which they are rendered upon the rights of all the parties who were before the court by such manner of process as would give the court jurisdiction of their person. But this rule is not without exceptions, and one of these exceptions arises, as we think, when a court undertakes to determine the descent and distribution of the estate of a person situated in another State so as to affect the rights of interested parties who have not been brought before the court by actual service of process and who have not entered their appearance. If Mrs. Augusta Baker, the mother, had entered her appearance in this Tennessee action or had been brought before the court by actual service of process, she would be conclusively bound by the judgment in its effect upon property everywhere until she procured its modification or vacation in some manner allowed by the law of Tennessee. But, as she was only before the court by constructive service, we do not think the Tennessee judgment conclusively determined her right to the personal estate of Charles Baker that was situated in this State, although it did so determine it as to the property that had a situs in Tennessee, and this determination remains conclusive until it is overthrown by appropriate proceedings in the courts of Tennessee.

When suit was brought on that judgment in this State for the purpose of taking hold of the personal estate situated in this State, we think Mrs. Augusta Baker had the right to question the extra-territorial effect claimed for it. Or, in other words, to contend in opposition to the judgment that she was entitled to her share under the laws of this State of the personal estate of her son having a situs in this State at the time of his death; leaving, however, in full force and effect the judgment so far as it operated upon the estate of Baker situated in the State of Tennessee at the time of his death, and giving to it in that State the full faith and credit to which it was entitled under the laws of Tennessee.

An interesting and sound discussion of the effect of the judgment of a sister State rendered on constructive service when attempted to be made operative upon property located in another State, may be found in Williams v. Preston, 3 J. J. Mar., 600. In that case the court

said: "It appears from the record that the appellant was 'no inhabitant' of Virginia, when the suit in chancery was instituted. * * * Taking it therefore as conceded that he was not only a resident but a citizen of Kentucky, we are of the opinion that the decree against him can have no other effect than to operate on his property which was within the jurisdictional limits of Virginia, and to attach which the suit in chancery was instituted.

"No court in Virginia could rightfully render a decree *'in personam'* against a citizen of Kentucky, unless by being in Virginia and served with process, or by entering his appearance, he gave the court personal jurisdiction. Either the person or some of his property must be within the jurisdiction of a court before it can render any decree against the person or thing. The property does not give jurisdiction over the person. If a citizen of Kentucky own property in Virginia that property is subject to the laws of Virginia and her courts may have jurisdiction over it. But he, whilst he shall remain in Kentucky, is not subject to the laws of Virginia, nor can her courts exercise any jurisdiction over him, except so far as to reach his property in Virginia. * * *

"So the court of chancery of Virginia had jurisdiction over the chose in action of the appellant, which was attached; but its power extended no farther. It could sequester the property and subject it to the payment of the appellee's debt, but it had no power to render a decree against the appellant affecting him otherwise than by acting on his property in Virginia." To the same effect are Harris v. John, 6 J. J. Mar., 257; Brand v. Brand, 116 Ky., 785; Downs v. Downs, 123 Ky., 405; Ely v. Hartford Life Ins. Co., 128 Ky., 799; Freeman on Judgments, Sections 564, 584; Black on Judgments, Sections 794, 795, 904 and 905.

In view of these authorities, and many others that might be cited, we think it safe to state it as a rule of general application that a court of one State has no jurisdiction to enter a judgment on constructive service affecting real or personal property situated in another State, its jurisdiction being confined to affecting by its judgment property situated in the State where the judgment was rendered.

This being so, it seems to us that there is no sound reason, so far as the rights of the parties to this suit are concerned, why this rule should not be applied in this case. The attempt is here made to affect property situated in this State by the Tennessee judgment to the same extent as if it was sought to affect it by a judgment in an attachment suit or a suit to enforce a mortgage or other lien obtained in the Tennessee court on constructive service.

But it is said by counsel that as the chancery court had unquestioned jurisdiction to determine that Baker was a resident of Tennessee, and as that was within the proper scope of the suit brought, the adjudication that he was a resident is conclusive upon this subject, and therefore it follows as an inevitable result of this that the widow is entitled to all of his surplus personal estate no matter where situated, if it were such character of personal estate as had a situs at the residence of the owner. It may be admitted that the question of Baker's residence was a proper subject for adjudication in that suit, but this adjudication should not be given extra-territorial effect when to do so would be to determine the status of property having a situs in this State.

It would be the merest evasion of the principle we have announced to say that a court on constructive process could not directly settle the descent and distribution of property in another State, but might conclusively but indirectly settle it by adjudging another point upon which the devolution of the foreign estate would depend, and this is precisely the effect here claimed for this Tennessee judgment. If this were a sound rule, then, for example, a judgment on constructive service might be rendered against a citizen of one State by a court of another State to the effect that he had signed and delivered the note sued on and it was a just and existing debt against him without going any further, and if suit were brought in the State of his residence upon this judgment, the defendant would be denied the right to make any defense that would defeat the debt, and judgment would inevitably go against him for the amount of it. It would further follow as a result of the recognition of the doctrine asserted by counsel that if a person died intestate in one State owning property in several States, the judgment first rendered in a court of any of these States that determined that he was a resident of

that State, with all the parties in interest before the court by constructive service, would affect in a conclusive and unimpeachable way the descent of his property in every State in which it was situated, although, in truth and in fact, the intestate may not have been a resident of the State.

In other words, under this rule, if a man died intestate, leaving estate situated in several States, and a suit setting up his residence therein was brought in each of these States by some of his heirs for the purpose of determining the descent and distribution of his estate, and the heirs residing in each of the other States were brought before the court by constructive service, then the judgment that was first rendered, if it recited that the deceased died a resident of that State, would be conclusive on the rights of all the heirs and settle the title to the estate situated in each of the States. The further effect of this doctrine would be that the rights of heirs in cases like this would be determined, not on the justness or merits of their respective claims, but on their diligence or ability to obtain the first judgment. It would be a race as to which could obtain the first judicial recognition of his asserted rights, with the prize depending on the speed with which the judicial machinery in each of the several States could be put in motion and adjudicate the question presented.

It appears to us that this method of settling the property rights of conflicting claimants by judicial action ought not for a moment to be entertained. It would give to the swift an advantage they ought not to have and take from the slow rights of which they ought not to be deprived.

How, then, it may be asked, and indeed is, are the rights of heirs to be determined when there is property of the decedent situated in several States? Our answer is, that the courts of each State in which the estate has a situs at the time of the death of the deceased have jurisdiction, in a suit brought for that purpose, and in which all of the interested parties are brought before the court by constructive service of process, to determine between them their respective rights to the property situated within the State. And if one or more valid domestic judgments are thus rendered, the force of these judgments is to be confined within the jurisdiction of the court rendering the judgment, the order in which the

judgments were rendered not being controlling, the last judgment being equally as effective as the first and the first of no more force than the last.

With this status existing between heirs having antagonistic interests, each relying upon the judgment most favorable to him, the question comes, how could the heirs who were not satisfied with the property received under the judgment they had obtained impeach or overthrow the judgment in the other State? Our answer to this is, that the parties to any of these judgments may take the judgment they depend on and go into any of the other States in which judgments were rendered, or in other States in which estate is situated, and bring a suit in a court of competent jurisdiction in that State for the purpose of having the rights of the parties to the property in that State settled, and in that court the rights of all the parties in interest who are brought before the court by actual service of process, or who entered their appearance would be conclusively settled as to the property in that State by the judgment rendered in the suit so brought, subject, of course, to the right to have it modified or reversed according to the practice of the State. This case furnishes a good illustration of our meaning. Mrs. Josie Baker brought in the McCracken Circuit Court a suit on the Tennessee judgment, and Mrs. Augusta Baker entered her appearance to that suit. So that the court had complete jurisdiction of both the persons and subject matter and the right to render a judgment that would be conclusive as between the parties as to the property situated in this State, leaving the Tennessee judgment in full effect as to the property situated in that State.

The remaining question, and the one that, according to our view of the law, is decisive of the rights of the parties to the property in this State is, was the domicile or legal residence of Charles Baker in Tennessee or Kentucky at the time of his death? This question we are fully authorized to conclusively dispose of, because all the parties are actually before the court and each of them has had opportunity to make defense to the claim asserted by the other. If Charles Baker died a resident of Kentucky, then his personal estate, practically all of which has a situs at the place of his residence, passed under the law of descent and distribution in this State. On the other hand, if he died a resident of the State of Tennessee, then it must pass under the laws of that State.

We think he died a resident of this State, and will proceed to state the reasons that have induced us to come to this conclusion.

That he was born in Tennessee and lived there until 1901, when he moved to Paducah, Kentucky, where he lived until he died, is admitted. Tennessee being then his domicile of origin, using the word domicile interchangeably with legal residence, the disputed issue is, did he change his residence and take up a residence of choice in Paducah? If he did the presumption is that his domicile of choice continued until his death.

On the one hand, it is contended that he came to Paducah with the intention of making that his residence and continued a resident of that place until his death, or, that whatever his intention was, his acts and conduct after he came to Paducah constituted him in law a resident of that place.

On the other hand, it is contended that he came to Paducah merely for the purpose of engaging in business without any intention of making it his home, and never established by his acts or conduct a legal residence in Paducah.

The legal principles determining the place of residence when it is in dispute are fairly well established. The difficulty arises only when it is attempted to apply these principles to the facts of each particular case. Generally speaking, a person cannot have a legal residence in two States or countries, although he may have an actual residence in many places. His actual residence may be in one place and his legal residence may be in another. It does not always follow that the place of actual residence is the place of legal residence, as a person may have an actual residence at a place where he is only temporarily located and where he has no intention of remaining permanently or indefinitely, while his legal residence will be at that place where he intends to remain permanently or indefinitely. Often, too, the place of legal residence is fixed both by intention and acts, and where both of these conditions concur, there is little trouble in determining the residence; but in other cases it is difficult to reconcile the intention with the acts, and when a condition like this arises, the law will, from facts and circumstances, fix the legal residence of the party.

Out of a great number of cases on this subject we think the following may be selected as stating in a general way the rules of law that control. In Gilbert v. David, 235 U. S., 561, 59 L. Ed., ——, the Supreme Court, quoting with approval authorities, said: ''If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed domicile, it is to be deemed his place of domicile, notwithstanding he may entertain a floating intention to return at some future period.''

In Ringgold v. Barley, 5 Md., 186, 59 Am. Dec., 107, the court said: ''Whence once removed to his new domicile, however, the party's purpose to remain need not be fixed and unalterable. If it becomes a place of fixed present domicile, it will be sufficient to fix a residence, and although there may be a floating intention to return to his former place of abode at some future period, still these circumstances will not defeat the newly acquired residence or the rights and obligations which attach to it.''

In Gilman v. Gilman, 52 Me., 165, 83 Am. Dec., 502, the court said: ''But if a citizen of Maine, with his family, or having no family, should go to California to engage in business there, with the intention of returning at some future time, definite or indefinite, and should establish himself there, in trade or agriculture, it is difficult to see upon what principle his domicile could be said still to be here. His residence there, with the intention of remaining there a term of years, might so connect him with all the interests and institutions, social and public, of the community around him, as to render it not only proper but important for him to assume the responsibilities of citizenship, with all its privileges and its burdens. Such residences are not strictly within the terms of any definition that has been given; and yet it can hardly be doubted that they would be held to establish the domicile.''

In Helm's Trustee v. Com., 135 Ky., 392, this court, quoting with approval Cooley on Taxation, said: ''No exact definition can be given of domicile. It depends upon no one fact or combination of circumstances, but from the whole, taken together, it must be determined in each particular case. * * * From this point of view it is manifest that very slight circumstances must often decide the question. It depends upon the pre-

ponderance of evidence in favor of two or more places; and it may often occur that the evidence of fact tending to establish the domicile in one place would be entirely conclusive were it not for the existence of facts and circumstances of still more conclusive and decisive character, which fix it beyond question in another."

In Boyd's Exor. v. Com., 149 Ky., 764, the court quoted with approval this language: "It is difficult to lay down any rule under which every instance of residence could be brought, which may make a domicile of choice. But there must be to constitute it actual residence in the place, with the intention that it is to be a principal and permanent residence. That intention may be inferred from the circumstances or conditions in which a person may be as to the domicile of his origin, or from the seat of his fortune, his family and pursuits of life. A removal which does not contemplate an absence from the former domicile for an indefinite and uncertain time is not a change of it. But when there is a removal, unless it can be shown or inferred from circumstances that it was for some particular purpose, expected to be only of a temporary nature, or in the exercise of some particular profession, office or calling, it does change the domicile." City of Lebanon v. Biggers, 117 Ky., 430; Graves v. City of Georgetown, 154 Ky., 207, and City of Winchester v. VanMeter, 158 Ky., 31, are also illustrative cases upon this subject.

When we come now to attempt to apply the principle of these cases we are confronted with a mass of evidence on the subject of Baker's intention that is apparently in conflict with his acts and conduct, but out of all of it we think sufficient facts and circumstances can be gleaned to establish with certainty Paducah as the place of his legal residence when he died.

That he was warmly attached to Savannah, Tennessee, the place of his birth, and his home for many years, is shown by many statements made by him to different persons and at different times and places; and there is also much evidence of his expressed intention to return at some time to Savannah and make that place his permanent home. For example, he would often say that his home was at Savannah. That neither he nor his wife would be happy until they got back there. That he was going to build a house at a certain place in Savannah, and that he was in Paducah only for the pur-

pose of making money, and after he had accumulated a sufficiency he was going back to his old home in Tennessee.

When approached by candidates at Paducah and asked to vote for them, he would often say he could not do it because he voted in Tennessee. He would also say that he never owned a home in Paducah and did not own any real estate there, and did not want to buy any, as when he bought a home he was going back to Tennessee. Other witnesses say that he took an interest in Tennessee politics and at times observed that he did not want to give up his citizenship in that State. He told others that he had never voted in Paducah; that it was a good place in which to make money, but not to live; and on one occasion when speaking to a lawyer about writing his will he told him that his home was in Tennessee and that he never claimed Paducah as his home. To other persons he said that he never paid any taxes in Kentucky, as he was a citizen of Tennessee and voted there and paid his poll tax there and expected to die there. There is also evidence that at the time of his death he was going to Savannah for the purpose of making some arrangements about building a house there. And it appears that he was assessed and paid a poll or head tax in Hardin county, Tennessee, in 1901 and 1902 and also in 1906.

That he had an affectionate regard for the State of his birth may well be conceded, but many of his expressions of attachment for the State and its people are attributable to the circumstance that the firm of Baker, Eccles & Company drew a large part of its business from the State of Tennessee, and its members were especially anxious to retain the friendship and good will of Tennessee people. With this business object in view it appears that they never neglected an opportunity to indulge in agreeable speeches about that State. As illustrating this, E. W. Baker, a brother, who moved from Savannah to Paducah at the time the firm was organized, said: "As a matter of policy for the benefit of the business we referred continually to Savannah as home and our attachment for the place and done everything of the kind that we could think of that would foster a sentiment on the Tennessee River in favor of our business."

It is also manifest from the evidence that Charles Baker was a very genial man, with a disposition to be on friendly terms with every person with whom he came in contact. He liked to leave everyone in a good humor and made it a point to do and say things that would make a favorable impression on all with whom he had intercourse. As an example of this, it is shown that in telling candidates for office in Paducah that he could not vote for them, he gave as a reason that his home was in Tennessee in order to get rid of their importunities on the easiest terms and in such a way as not to give offense.

It is easily explainable why he paid his poll tax in Tennessee in 1901 and 1902, as it seems he did not leave there until some time in 1901, but why he should have paid a poll tax there in 1906 is not explained by the record. It is certain, however, that he did not pay any poll tax there in 1903 or 1904, or after 1906, and it is also shown in a very satisfactory way that after 1901 he did not cast a vote in the State of Tennessee.

If the place of Baker's residence had to be determined alone by intention manifested in speeches without any reference to the acts and conduct, that will presently be referred to, we would have little doubt in adjudging that he never lost his legal residence in Tennessee and only had an actual residence in Paducah for the purpose of conducting the business in which he was there engaged, all the while having it in mind to return to Tennessee when the objects of his sojourn in Paducah had been accomplished.

But when we turn to the other side of the case we find abundant reason for the opinion that, notwithstanding the "floating intention," as it is expressed in some of the cases, of Baker, he not only had an actual residence in Paducah, but acquired a legal residence there, which he retained until his death. He was not only actively engaged in business in Paducah for about eleven years continuously, but he actually resided there during the whole of this time and took an active part in the politics of the place. Several witnesses testify that he told them when candidates for office that he would vote for them, and after the election told them that he had voted for them. There is also evidence that he registered as a voter and paid a poll tax there. He was thoroughly identified with the social and business life of the place while he lived there, and, in short, so far as his acts and con-

duct were concerned, he was as much a citizen of Paducah as any other person who lived there; and about an hour before he died told the captain of the steamboat on which he was being carried on his expected visit to Savannah that "he was going to Savannah and would probably stay there until after the fair and was then coming back to Paducah and would vote for Wilson."

It is true he did not own a home in Paducah, but as he had no family except his wife, he probably thought, as do many other people so situated, that he could board with more comfort and less expense than he could keep house. He had no business interests in Tennessee except the land that had been given to him, and that was rented out. If, under these facts and circumstances, Baker could not be regarded as a citizen and resident of Paducah, it would be difficult to establish the place of legal residence on conflicting evidence.

For the reasons stated, we think the judgment dismissing the petition of Mrs. Josie Baker should be affirmed, as the effect of the order of dismissal was to adjudge that Charles Baker died a resident of Kentucky, and, therefore, his mother was entitled to one-half of his surplus personal estate in this State and his widow to the other one-half. It is true the judgment appealed from did not so decree, but it is evident that the court merely dismissed the petition instead of entering such a judgment because it was of the opinion that the judgment rendered in the suit of Mrs. Augusta Baker, as administratrix, against Mrs. Josie Baker sufficiently determined the rights of the parties, and it was unnecessary to again adjudge the matter. But, on a return of this case, the lower court will enter a judgment that Charles Baker died a resident of Kentucky, and that his mother, Mrs. Augusta Baker, is entitled to one-half and his widow, Mrs. Josie Baker, to one-half of his personal estate situated in this State at the time of his death, after the payment of his debts. The judgment should also direct Baker, Eccles & Company to cancel all certificates of stock issued by it to Charles Baker and to reissue one-half of the shares to Mrs. Josie Baker and one-half to Mrs. Augusta Baker. Such other matters may be embraced in the judgment as will, after the payment of debts, distribute equally between the widow and the mother all other personal estate situated in this State of which Charles Baker died possessed.

Wherefore, the judgment is affirmed.